## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DOROTHY M.,[1]                                        Case No. 1:21-cv-346

        Plaintiff,                                  Bowman, M.J.

   v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Dorothy M. filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents four claims of error for this Court's review.  For the reasons explained below, the ALJ's finding of non-disability will be REVERSED and REMANDED for additional review, because it is not supported by substantial evidence in the record as a whole.

### I.  Summary of Administrative Record

On October 4, 2019, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning on January 2, 2019.  In her application, Plaintiff alleged disability based upon diabetes, morbid obesity, cirrhosis of the liver, low back problems, dizziness and balance issues, diabetic retinopathy and macular edema, and

---

[1]Due to significant privacy concerns in social security cases, the Court refers to claimants only by their first names and last initials.  *See* General Order 22-01.
[2]The parties have consented to the jurisdiction of the undersigned magistrate judge.  *See* 28 U.S.C. §636(c).

depression and anxiety. (Tr. 229). After her application was denied initially and on reconsideration, Plaintiff requested an evidentiary hearing. On December 15, 2020, Plaintiff appeared with counsel and testified before Administrative Law Judge ("ALJ") Renita Bivens. A vocational expert also testified. (Tr. 64-116). On February 24, 2021, the ALJ issued an adverse written decision. (Tr. 37-57).

Plaintiff has a high school education and earned a bachelor's degree in computer information systems. (Tr. 42). She was "an individual of advanced age" but – at three weeks shy of her 60th birthday - not quite in the "closely approaching retirement age" at the time of the ALJ's decision. Plaintiff previously worked in skilled labor positions including as a metallurgical laboratory assistant performed at the medium exertional level, as an accountant clerk performed at the sedentary exertional level, and as a chemical laboratory technician performed at the light to medium exertional level. In addition, Plaintiff held a semiskilled job as a production clerk that she performed at the medium exertional level, but which is listed in the Dictionary of Occupational Titles as sedentary work. (Tr. 56). Plaintiff testified that she was fired from her last position as an accountant clerk on her alleged disability date, January 2, 2019, for performance issues related to her impairments. (Tr. 93; *see also* Tr. 924 (reporting she was fired due to vision issues and her "concentration")). She has not worked since that date.

In her decision, the ALJ determined that Plaintiff has the following severe impairments: "a disorder of the back; obesity; diabetes mellitus; non-proliferative diabetic retinopathy; chronic liver disease with hepatic encephalopathy and nonalcoholic steatohepatitis (NASH); and esophageal reflux." (Tr. 40). Plaintiff does not dispute the ALJ's determination that none of her impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 43).

2

After considering the record, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work, subject to the following limitations:

> [S]he is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently; she is able to stand and/or walk 6 hours per 8-hour day and sit 6 hours per 8-hour day with normal breaks; she can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolding; she can frequently balance; she can occasionally stoop, kneel, crouch, and crawl; she has limited visual acuity but retains sufficient visual acuity to perform work that does not require fine visual acuity, like tying thread or a threading needle; she must avoid concentrated exposure to extreme cold, extreme heat, humidity, and vibration; and she must avoid all exposure to hazards of unprotected heights, such as, ladders, ropes or scaffolds, and heavy machinery.

(Tr. 44). After considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert,[3] the ALJ further determined that Plaintiff could still perform two of her prior jobs, as a production clerk and as an accountant clerk. (Tr. 56). Therefore, the ALJ determined that Plaintiff was not under a disability. (Tr. 67). The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In her appeal to this Court, Plaintiff contends that the ALJ erred by: (1) failing to identify her anemia as a severe impairment at Step 2; (2) improperly evaluating Plaintiff's subjective symptoms, particularly relating to her poor vision, fatigue, and dizziness; (3) erroneously evaluating the medical opinion evidence including the opinions of two treating physicians; and (4) erroneously relying upon VE testimony that misidentified her past relevant work. Because the ALJ's decision does not sufficiently articulate the basis for her evaluation of the medical opinion evidence, this case should be reversed and

---

[3]In a clerical error, the ALJ misidentified the accountant clerk job by an incorrect DOT number.

3

remanded for further review. On remand, the ALJ should also revisit the analysis of Plaintiff's anemia, of Plaintiff's subjective symptoms, and of the RFC determination.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

4

*Id.* (citations omitted). *See also Biestek v. Berryhill*, 139 S. Ct.1148, 1154 (2019) (holding that substantial evidence is evidence a reasonable mind might accept as adequate to support a conclusion and that the threshold "is not high").

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity ("SGA"); at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

**B. Plaintiff's Claims**[4]

The Medical-Vocational Guidelines (Grid Rules) generally presume disability for an individual of advanced age who cannot perform past work, unless the individual possesses transferrable skills and can still perform work at the sedentary or light exertional levels. *See e.g.*, 20 C.F.R. Pt. 404, Subpt. P, App. 2; 20 C.F.R. § 404.1568(d)(4). Because the ALJ determined that Plaintiff still could perform two of her past positions, the ALJ concluded she was not disabled on that basis and did not determine whether there were other jobs that Plaintiff could still perform. Plaintiff asserts that the ALJ made multiple errors in concluding that Plaintiff can perform her past work.

**1. The ALJ's Evaluation of the Opinion Evidence**

The record contains the following medical opinions: (1) a consulting examination report by a medical expert; (2) an agency psychological examination report; (3) a total of four initial and reconsideration opinions by reviewing agency medical and mental health experts; and (4) two treating physician Medical Source Statements. Because Plaintiff filed her application after March 27, 2017, revised regulations apply to the evaluation of this body of medical opinion evidence. *See generally*, 20 C.F.R. § 404.1520c. Rather than assigning a particular "weight" to each opinion under a previously defined hierarchy of medical opinions,[5] the regulations now require the ALJ to determine the "persuasiveness" of each prior administrative medical finding or other medical opinion based upon a list of factors, the most important of which are "supportability" and

---

[4]The review of Plaintiff's claims was made more difficult by Plaintiff's citation solely to PageID numbers. In social security cases, counsel is <u>required</u> to cite to the Administrative Transcript. *See* Local Rule 8.1.A (d) "When citing to the administrative record in Social Security cases, parties must provide pinpoint citations to the administrative record, regardless of whether a party also chooses to provide PageID citations."

[5]Under the prior regulations, a treating physician's opinion was generally entitled to controlling weight. In addition, an ALJ was required to articulate "good reasons" if he or she gave less-than-controlling weight to a treating physician's opinion. *See* 20 C.F.R. § 404.1527(c)(2) (2016).

"consistency." *See* 20 C.F.R. § 404.1520c(b)(2). Supportability focuses on the provider's explanations for his or her opinions, and includes whether the opinions are supported by relevant objective medical evidence (such as lab results or imaging studies) or other supporting explanations. *See* 20 C.F.R. § 416.920c(c)(1). Consistency is defined as the extent to which an opinion or finding is consistent with evidence from other medical or nonmedical sources. 20 C.F.R. § 416.920c(c)(2).

The revised regulations impose new procedural articulation requirements for <u>all</u> consulting, treating, or reviewing sources who offer medical findings or opinions. *See* 20 C.F.R. § 404.1520c. Thus, the ALJ must *explicitly* discuss how the two "most important" factors of supportability and consistency have been considered in determining the persuasiveness of *each* medical source's opinion.

> The factors of supportability… and consistency… are the most important factors….Therefore, **we will explain how we considered the supportability and consistency factors** for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the [other listed] factors….

20 C.F.R. § 404.1520c(b)(2) (emphasis added). In this case, the ALJ acknowledged the new standard when she stated she "cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources." (Tr. 51). However, the ALJ's articulated analysis was legally deficient.

### a. The ALJ's Analysis of Dr. Kadakia's Opinions

Defendant concedes that the ALJ failed to articulate how persuasive she found the opinions of Plaintiff's long-term primary care physician, who has treated Plaintiff every 3-6 months since 2006. On the record presented, this error alone supports remand.

On April 6, 2020, Dr. Kadakia handwrote out responses to a physical RFC questionnaire.  (Tr. 1108-1111). She lists the following diagnoses: cirrhosis (NASH) with encephalopathy and esophageal varices, Diabetes Type II on insulin with macular edema and diabetic retinopathy, plantar fasciitis, anxiety/depression, obstructive sleep apnea, hypothyroidism, morbid obesity, and spondylosis of the lumbar spine with chronic low back pain.  She opines that her patient has a "poor" prognosis.  (Tr. 1108).  She lists the following symptoms: "mental confusion which the patient does not perceive, imbalance difficulty walking, slurred speech, needs magnification glass to see, severe diarrhea [from Lactulose]." (Tr. 1108).  Dr. Kadakia also describes "moderately severe pain in [illegible] both feet and lower back, worse with walking, unable to use Tylenol or NSAIDs due to chronic medical condition."  She identifies supporting clinical findings:  "Unsteady gait, requiring assistance to stand or get on exam table.  Difficulty reading.  Mental confusion. Depressed mood/affect." (Tr. 1108).  She circles "frequently" in response to the question of how often Plaintiff's symptoms would interfere with attention and concentration, and opines that Plaintiff has "marked limitation" to deal with work stress.  Dr. Kadakia further states that her patient can stand/walk less than 2 hours in a day, and sit for "about 4 hours." (Tr. 1109).  Dr. Kadakia identifies "limited vision, mental confusion" as two limitations in particular that would impact Plaintiff's ability to work "on a *sustained* basis." (Tr. 1011, emphasis added).  Dr. Kadakia responds "No" to a question asking whether Plaintiff requires a cane for "occasional standing/walking," then adds:  "But requires cane with prolonged walking." (Tr. 1110).

After summarizing the limitations endorsed by Dr. Kadakia, the ALJ offers the following analysis:

> The undersigned notes that Dr. Kadakia's opinion is reasonable but not supported by other evidence in file. The medical evidence of record in file

8

does not support the obligatory use of an assistive device (cane, walker, etc.). Also, [as] recently as the month prior, the claimant was still a caregiver cooking, cleaning, administering medications, assisting her mother to the restroom and performing laundry related activities, as well as shopping with no prescribed cane (testimony)

(Tr. 52).

Defendant suggests that, given the failure to adopt Dr. Kadakia's opinions, the ALJ must have found those opinions to be "minimally persuasive." Defendant urges this Court to affirm on the basis that remand "has never been required to correct minor errors … if it would not change the overall result." (Doc. 9 at 14).

Remand is required here because the ALJ's articulation error was far from "minor." The questionnaire completed by Dr. Kadakia was not a "check-the-box" form but called for multiple narrative responses. The ALJ not only failed to articulate the "persuasiveness" of Dr. Kadakia's opinions but also failed to discuss the critical "supportability" factor despite describing her opinions as "reasonable." Dr. Kadakia's opinions were supported by the objective clinical observations that were stated on the form, as well as by some clinical records.[6] While the ALJ very briefly discussed the "consistency" factor, she appears to have discounted nearly all of Dr. Kadakia's opinions based upon a single reference to cane use – even though Dr. Kadakia clearly stated that no cane was required except for "prolonged" walking.[7] The only other basis for discounting the credibility of Dr. Kadakia's opinions was the ALJ's conclusion that all of the opinions were inconsistent with Plaintiff having been a caregiver for her mother until

---

[6] On 4/2/20, Dr. Kadakia noted that "per sister patient having episodes of elevated ammonia levels which cause confusion, slurred speech, and imbalance. Patient often not aware that is occurring and causing impairment." (Tr. 1170; *see also* Tr. 1873, 8/31/20 routine office visit positive for confusion, depression; Tr. 1875, self management abilities assessed to be only "fair").

[7] As the ALJ acknowledged, the record contains a recent prescription for cane use from an orthopedic physician.

9

she died in March 2020. However, the record contains evidence that Plaintiff had shared a home with her mother for twenty years and that her "caretaking" responsibilities were extremely limited and not necessarily inconsistent with Dr. Kadakia's opinions. There is also evidence that after her mother's death in early March 2020, Plaintiff's own health further declined.

### b. The ALJ's Analysis of Dr. Weber's Opinions

The ALJ provided somewhat greater analysis of the opinions of a second treating physician, Dr. Weber, a specialist who treated Plaintiff for her chronic and severe liver disease including her cirrhosis and encephalopathy. While Dr. Weber's opinions were not identical to those expressed by Dr. Kadakia, the two treating physician opinions were similar in that both included postural and other limitations that precluded sedentary work.

An April 2020 office note from Dr. Weber expresses concern with the growing severity of Plaintiff's encephalopathy and her inability to tolerate lactulose as a treatment to reduce her ammonia levels, and opines that disability "is needed." (Tr. 1200). On May 7, 2020, Dr. Weber completed a formal physical RFC questionnaire, (Tr. 1265-1268) that lists diagnoses of "cirrhosis with NASH & varicoses [sic] and hepatic encephalopathy" and indicates Plaintiff's prognosis is "poor." (Tr. 1265). Dr. Weber states that Plaintiff has symptoms of "dizziness[,] confusion …[illegible]" but reports "more memory loss than pain." He cites to clinical findings/objective signs of "hepatic [encephalopathy] and macular edema." (Tr. 1265).

In response to a question about how long his patient "can sit and stand/walk *total in an 8 hour working day* (with normal breaks)" (emphasis original), Dr. Weber responds "less than two hours." (Tr. 1266). Dr. Weber opines that Plaintiff's symptoms are severe enough to interfere with attention and concentration "frequently" and that she has "severe

limitation" in her ability to deal with work stress, with a high rate of absenteeism. (Tr. 1266, 1268). He states that he is trying a new prescription based on Plaintiff's inability to tolerate prior treatment to reduce her ammonia levels. (Tr. 1265).

Dr. Weber appears to have been reluctant to respond to some questions. For example, he wrote "unclear" in response to a query about whether emotional factors "contribute to the severity of your patient's symptoms and functional limitations." (Tr. 1265). He states that Plaintiff has been diagnosed with depression, but was "uncertain" about whether Plaintiff's "physical impairments *plus any emotional impairments*" were "reasonably consistent with the symptoms and functional limitations described in this evaluation." (Tr. 1266, emphasis added). He also wrote "uncertain" in response to a query asking if Plaintiff needs a job "which permits positions at will." (Tr. 1267). In another area, he wrote simply: "pt unable to work at this time." (*Id.*)

In rejecting virtually all of Dr. Weber's opinions, the ALJ first suggested Dr. Weber's statement "that it was unclear whether any emotional factors that may have contributed to the severity of symptoms" reduced the credibility of his opinions, along with his response that he was "uncertain" if the claimant needed a job that permitted shifting position at will. (Tr. 53-54). However, it is odd to discount a physician's opinions on one limitation topic based upon the same physician's statement that he does not have an opinion on an entirely different type of limitation.

The ALJ also remarked: "[T]his opinion has two different handwritings on page 3, which makes it unclear as to who completed the form which limits persuasiveness." (*Id.*) But the "different" handwriting appears only on the first page in the "diagnosis" and "prognosis" sections. Neither Plaintiff's diagnoses nor her prognosis appear to be in dispute. It is also undisputed that Dr. Weber signed and dated the four-page form. The

11

Sixth Circuit has held that a treating physician's signature on an RFC form completed by another provider should be considered to be a treating source opinion. *See Hargett v. Commissioner of Social Security*, 964 F.3d 546 (6th Cir. 2020) (RFC form completed by physical therapist but signed by treating physician).

The ALJ next emphasizes that Dr. Weber was "uncertain" whether the claimant's impairments "are reasonably consistent with the symptoms and functional limitations described." (Tr. 53). While this may be a fair criticism, in context (including the placement of the question and reference to "emotional impairments" in the phrasing), Dr. Weber's concern/uncertainty may have been with the impact of Plaintiff's depression and/or emotional symptoms that he did not wish to evaluate.

The ALJ further criticizes Dr. Weber's opinions "that the claimant could walk zero city blocks without rest or severe pain, sit for 45 minutes at one time, and stand for five to 10 minutes at a time" as "internally inconsistent with his own opinion that the claimant could sit 2 hours and stand and/or walk for 2 hours each for total in an 8-hour workday with normal breaks." (Tr. 53-54). But Dr. Weber did *not* state that Plaintiff could sit and stand/walk "for 2 hours <u>each</u>." Rather, he opined, <u>consistent</u> with his other responses, that Plaintiff is capable of "less than 2 hours" of all postural activities <u>combined</u>. [8]

The ALJ offered more reasons for finding Dr. Weber's opinions to be "of only minimal persuasiveness":

> [C]laimant's past work…performed at the sedentary exertional level would not, based on regulation and the vocational expert testimony, require the claimant to walk around for 8-hours during the workday. Further… even if the claimant had required the use of a cane her past work at the sedentary exertional level could still be performed. Also note, as for his opinion

---

[8]The ALJ's misstatement was understandable. Most disability questionnaires ask for separate opinions on how many hours the claimant can sit, versus how long the claimant can stand or walk. The formatting of Question 15c is unusual because it asks an "all in one" question.

regarding absenteeism it is not supported by the overall evidence of record or his evaluation.

…Dr. Weber's opinion is also inconsistent with Dr. Kadakia's April 2020 opinion that the claimant was able to lift and carry 20 pounds occasionally and 10 pounds frequently, sit for 4 hours out of an 8-hour workday, and walk half a city block. … Further, the undersigned notes that Dr. Weber's expertise appears to be in gastroenterology and not orthopedics, and thus his opinion appears to be based on the claimant's subjective reporting. Dr. Weber's opinion is inconsistent with his treatment records that indicate that the claimant reported exercising by walking 20 to 30 minutes. See Exhibit 35F at 12. In September and October of 2019, the claimant's review of systems indicated no muscle aches, joint pains, tingling, numbness, no depression\anxiety and energy stable (Ex. 19F at 20, 41). Similarly, in March of 2020, the claimant's review of systems indicated no muscle aches, joint pains, tingling, numbness, no depression\anxiety and energy stable (Ex. 19F at 62). In August 2020, Dr. Carroll noted that the claimant's review of systems indicated she was negative for musculoskeletal symptoms of arthralgias, joint swelling, numbness in extremities, and weakness (Ex. 32F at 7). Dr. Carroll['s] examination found that the claimant's mood\effect was normal and she was oriented to person place and time (Ex. 32F at 8). Also of note, an examination by Dr. Weber in October 2020 found the claimant to have no spinal tenderness, no extremity tenderness, and her review of systems indicated she denied chronic back pain (Ex. 35F at 17, 20). Dr. Weber also noted that the claimant's mental status was "okay" (*Id*. at 17). The limits given by Dr. Weber do[] not appear to be based on any objective testing, such as, a physical examination, where he would have observed sitting, standing, walking, or lifting of objects. There is no such testing in the file and the claimant has no diagnoses of physical disease that would account for such extreme limitations in lifting, sitting, or standing. Furthermore, Dr. Weber's opinion that the claimant was unable to work at the time is not dispositive, is not dispositive as, [sic] as a statement by a medical source with opinions on issues, such as "unable to work" are opinions on issues reserved to the Commissioner and not persuasive (20 CFR 404.1527).

(Tr. 53-54).

The above articulation, which includes discussion of both "supportability" and "consistency" factors, would not necessarily support remand standing alone. Nevertheless, the ALJ should reexamine the "persuasiveness" of Dr. Weber's opinions on remand.  As stated, some of the articulated reasons appear to misconstrue the content

13

and context of Dr. Weber's opinions.[9] And, while it is true that Dr. Weber examined Plaintiff but did not perform objective testing to test postural limitations or lifting and carrying limits,[10] neither did the two reviewing physicians on whom the ALJ chiefly relied.

### c.  The ALJ's Analysis of Consulting Physicians' Opinions

The ALJ's analysis of all three agency consulting physician opinions underscores the need for remand.

On January 29, 2020,[11] Plaintiff was examined by an agency medical consultant, Dr. Phillip Swedberg.  (Tr. 931-935).  Plaintiff's chief complaint at that time was her vision, although she also reported impaired memory, focus and concentration, that others told her may be from ammonia levels caused by her liver disease.  (Tr. 931).  With respect to her vision, she stated that cataract surgery greatly improved her vision but complained of continued impairment from her diabetic retinopathy and macular edema.  She reported she receives periodic intravitreal injections of Eylea and sometimes uses a magnifying glass to read. (Tr. 932).  Upon examination, Dr. Swedberg found her visual acuity to be 20/30 in the right eye and 20/25 on the left.  He states that she is able to read "large print" with either eye, and notes that her vision does not prevent her from driving.  (Tr. 933).

Dr. Swedberg's report includes a medical history section that lists "diagnoses of fatty liver and cirrhosis" along with obstructive sleep apnea.  (Tr. 932).  However, he did

---

[9]In addition to the examples noted, Dr. Weber offered no opinions concerning cane use.  While Dr. Weber is not an orthopedist, he is a specialist in the treatment of Plaintiff's liver disease (including her hepatic encephalopathy), which he suggests causes dizziness and confusion. By contrast, Dr. Carroll – whose records the ALJ cited to discount Dr. Weber's opinions – is Plaintiff's treating ophthalmologist.

[10]In addition to the lack of physical testing, there appear to be no objective imaging studies of the brain, such as MRI, that document the severity of Plaintiff's encephalopathy.  At an examination on 4/5/20, Dr. Weber noted that Plaintiff previously had been diagnosed with "mild encephalopathy" but that "it appears that recently this is more severe…." (Tr. 1199). That impression appears to be based upon Plaintiff's reports as well as Plaintiff's sister's observations. (*See also* Tr. 1927, October 22, 2020 progress note).

[11]The ALJ misstates the year of Drs. Swedberg's and Stoeckel's examinations as 2019.  (Tr. 49).

not identify either Plaintiff's back disorder or her hepatic encephalopathy under either history or under the "Impression" section at the conclusion of his report. In the latter section, Dr. Swedberg listed only: (1) diminished visual acuity based upon her prior cataract and laser surgery, with macular edema; (2) Type II diabetes with diabetic retinopathy; (3) "rule out polypharmacy" based on the fact that Plaintiff takes thirteen different prescription medications; and (4) morbid obesity.[12] As summarized by the ALJ,

> Dr. Swedberg opined that based on the findings of his examination, the claimant appeared capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects. In addition, the claimant had no difficulty reaching, grasping, and handling object. There were no communication limitations nor were there environmental limitations.

(Tr. 52). The ALJ found Dr. Swedberg's opinions to be "generally persuasive."

The ALJ erred by failing to discuss the "supportability" of Dr. Swedberg's opinions.[13] Curiously, the ALJ indirectly acknowledged the *lack* of supportability with objective evidence concerning Plaintiff's back disorder. With respect to that evidence, the ALJ rationalized that although Dr. Swedberg's opinion was "not necessarily …contrary to x-rays showing multilevel lumbar degenerative changes…, it is definitely supported by other objective testing, showing the claimant also had normal manual muscle testing and range of motion testing." (*Id.*)[14] Notably, the ALJ did not discuss Dr. Swedberg's failure to reference Plaintiff's severe impairment of hepatic encephalopathy, which Plaintiff

---

[12]Plaintiff is morbidly obese (Type III obesity) with BMI in excess of 40. The ALJ discussed SSR 19-2, which requires consideration of the limiting effects of obesity.

[13]The ALJ did include a brief discussion of the "consistency" factor, finding Dr. Swedberg's opinions to be "generally consistent with subsequent treatment records indicating… mental status was within normal limits," a lack of "muscle aches, joint pains tingling, numbness…depression and/or anxiety," with "stable" energy. (Tr. 52).

[14]The ALJ's reference in this context is best understood as a discussion of the "consistency" factor, since "supportability" focuses on the *provider's* explanations for his opinions, as opposed to the ALJ's analysis of the consistency of Dr. Swedberg's opinions with other evidence.

alleges causes extreme fatigue, intermittent neurological impairment including confusion and slurring words, and dizziness.

Two agency consultants, Drs. Siddiqui and Green, reviewed Dr. Swedberg's report along with other evidence and offered specific RFC opinions at the initial and reconsideration levels.   On February 17, 2020, Dr. Siddiqui, M.D. found "a primary diagnosis of severe degenerative disc disease (discogenic and degenerative disorders of back), a secondary diagnosis of obesity, and other diagnoses of severe chronic liver disease and cirrhosis, severe loss of visual efficiency or visual impairment, severe diabetes mellitus, nonsevere depressive, bipolar and related disorders, and nonsevere anxiety and obsessive-compulsive disorders."  (Tr. 42; *see also* Tr. 126).  Although Dr. Siddiqui referenced Plaintiff's back disorder, Dr. Siddiqui also failed to refer to Plaintiff's hepatic encephalopathy.  She opined that Plaintiff

> could occasionally lift and/or carry 20 pounds; she could frequently lift and/or carry 10 pounds; she could stand and/or walk for a total of about 6 hours in an 8-hour workday; she could sit for a total of about 6 hours in an 8-hour workday; her ability to push and/or pull (including operation of hand and/or foot controls) was unlimited, other than shown, for lifting and/or carrying; she could occasionally climb ramps or stairs; she could never climb ladders, ropes, or scaffolds due to obesity; she could occasionally stoop, kneel, crouch, or crawl; and she had to avoid all exposure to hazards (machinery, heights, etc.).

(Tr. 54).  Dr. Siddiqui found no other limitations, including no visual limitations.

On July 21, 2020, Dr. Green listed nearly the same diagnoses as Dr. Siddiqui.[15] He also offered nearly identical RFC opinions, except for an additional postural restriction to "frequent" balancing, and expansion of environmental restrictions to the avoidance of

---

[15]Unlike Dr. Siddiqui, Dr. Green listed "chronic liver disease" *without* including "cirrhosis."  (Tr. 141). Dr. Green also assessed "severe visual disturbances" rather than the "loss of visual efficiency."

"concentrated exposure to extreme cold, extreme hot, humidity, vibration or hazards (machinery, heights, etc.)."  (Tr. 54-55; Tr. 144-45).

The ALJ found both Dr. Siddiqui's and Dr. Green's opinions to be "generally persuasive," relying heavily relied upon both to support an RFC determination that permitted Plaintiff to perform her past work.  (Tr. 54).  The ALJ's entire discussion of the two opinions is as follows:

> Although the DDS initially did not find the environmental limitations to extreme cold, extreme hot, humidity, an[d] vibration, the undersigned finds that State Agency medical consultants' opinions were generally persuasive. Dr. Green's additional environmental limitations are incorporated into the above found residual functional capacity based on obesity and diabetes mellitus. However, the undersigned notes that the DDS opinions are internally inconsistent, as they indicate that the claimant has visual disturbances that are severe but provided no visual limitations. The DDS opinions are incorporated in to the above found residual functional capacity except that the visual limitation is added by the undersigned to account for the claimant's non-proliferative diabetic retinopathy.

(Tr. 55).  The ALJ's only other reference to the opinions is a finding that "the DDS findings on the physical impairments are more consistent with the medical evidence of record" than Plaintiff's allegations, which the ALJ found to be "inconsistent with the record as a whole."  (*Id.*)

Conceding that the ALJ failed to discuss the "supportability" factor, Defendant again urges this Court to affirm on grounds that the procedural errors are "harmless." (Doc. 9 at 10).  Defendant notes that agency physicians "are considered experts in the field of disability evaluation." (*Id.*)  Defendant contends that this Court should find "the ALJ subjected the assessment[s] of the reviewing doctors to proper scrutiny" based upon the ALJ's added visual restriction to a job "that does not require fine visual acuity, like tying thread or a threading needle," (Doc. 9 at 11 and Tr. 44).

17

As Plaintiff points out, however, the ALJ's RFC formulation does not take into account the suggestion in Dr. Swedberg's report and elsewhere in the record that Plaintiff may be limited to reading "large print." And the ALJ made the same articulation error with respect to a treating physician's opinion as well as the consulting opinions.[16]

The failure to explicitly discuss "supportability" and "consistency" may or may not require remand in any particular case. However,

> [t]he regulations are clear and imperative in defining the mode of analysis. All medical sources are to be considered, and a rationale articulating how the ALJ applied the factors specified in the regulations must be stated for each source.

*Hardy v. Com'r of Soc. Sec.*, 554 F.Supp.3d 900, 909 (E.D. Mich. 2021) (reversing and remanding based upon an ALJ's failure to comply with the new articulation requirement); *accord Miles v. Com'r of Soc. Sec.*, 2021 WL 4905438, at *4 (S.D. Ohio Oct. 21, 2021) (remanding and holding that ALJ did not satisfy the mandate to discuss the supportability factor by virtue of her earlier recitation of Plaintiff's entire medical record and identification of instances where the medical records did not support a finding of disability).

Here, there is evidence in the record that could support both treating physicians' opinions, and/or that could support or undermine the prior medical findings of the agency consultants. "It is not the role of a reviewing court to comb the record and imagine manifold ways in which the factors [of consistency and supportability] could have been applied to the evidence that was presented." *Hardy*, 554 F. Supp.3d at 909. Therefore, the ALJ's articulation errors cannot be dismissed as harmless.

---

[16](*See also* Tr. 51-52 (discussing consistency of consulting psychological examiner's opinions with mental status evidence from other providers, but not supportability)).

### 2. The ALJ's Failure to Find Anemia at Step 2

In another claim, Plaintiff faults the ALJ for failing to list anemia as a severe impairment. Plaintiff herself did not list anemia on her application for disability, although the condition is noted throughout the medical record. During the hearing, Plaintiff's attorney pointed out that Plaintiff's list of impairments included "[p]ernicious anemia." (Tr. 79). In response, the ALJ stated: "That was resolved with medication." Plaintiff's counsel made no further comment, moving on to a discussion of other impairments. (*Id.*) The ALJ found anemia to be non-severe, citing medical records that reported Plaintiff had no muscle weakness and that her energy level was "stable." (Tr. 40). On appeal, Plaintiff points out that the term "stable" does not indicate that her energy level was good, and that she testified to the fact that she experiences chronic and severe fatigue.

Despite failing to find anemia to be "severe" at Step 2, the ALJ determined that other impairments were severe and stated that she had considered all of Plaintiff's impairments, including anemia, in the remaining sequential steps. In light of that fact, the alleged Step 2 error ordinarily would not require reversal. *Mariarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (where the ALJ found a severe impairment, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is [] legally irrelevant."). On the other hand, because remand is required for a different error, the ALJ should re-evaluate the potential impact of any fatigue relating to anemia, including the impact on Plaintiff's ability to sustain fulltime work.

### 3. The ALJ's Subjective Symptom Analysis

Plaintiff also argues that the analysis of her subjective symptoms is not substantially supported. An ALJ's assessment of subjective symptoms is generally given

19

great deference. *See Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). In fact, a credibility/consistency determination[17] cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). However, because the assessment of subjective symptoms may be impacted by further analysis of the opinion evidence and anemia, the ALJ is also directed to re-assess Plaintiff's subjective complaints of vision limitations, fatigue, and intermittent symptoms that may be caused by Plaintiff's hepatic encephalopathy.

The ALJ discounted many of those complaints based upon the fact that Plaintiff, who had never married and lived in her parents' home for the past twenty years, helped to care for her mother as she aged, until her death on March 10, 2020. (Tr. 289; *see also* Tr. 92). At the hearing, Plaintiff testified that she prepared meals and helped her mother get cleaned up in the morning, gave her medicine and assisted her at night when she had to use the bathroom, and "occasionally" did some laundry. However, she also explained that she was not able to do "a whole lot else…as time went on because [it was] getting too hard for me." (Tr. 71). Over time, a sister would come over two hours per day to care for their mother. (Tr. 71, 92)

Another sister, Judy Kelly, explained that for the past two years, Plaintiff had been able to offer only "limited support" to their mother. (Tr. 289). The family hired an aide two days a week and hired another sister to come to cook, organize medications and bathe their mother because Plaintiff couldn't handle those tasks due to "extreme exhaustion,"

---

[17]An ALJ's assessment of subjective symptoms, formerly referred to as the "credibility" determination in SSR 96-7p, was clarified in SSR 16-3p to remove the word "credibility" and refocus the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as <u>consistent</u> with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017) (emphasis added).

as well as Plaintiff's dizziness, lack of balance and vision issues. (*Id.*) However, Plaintiff still would warm up Meals on Wheels dinners and make sure their mother took evening medications. (Tr. 289). Ms. Kelly states that after their mother's death, Plaintiff's health continued to decline,[18] and that she observed a lack of fine motor skills, an inability to read without a magnifying glass, more pronounced and frequent difficulties with memory and word-finding, episodes of sudden confusion, and slurring words due to her advanced liver disease and associated high ammonia levels. (Tr. 290).

Plaintiff offered this report of how her vision and other impairments impacted her prior work as an Accounting Clerk:

> My vision has been getting worse especially close up work like computers and reading small print. I requested a larger screen but it still wasn't big enough to help me see numbers and letters correctly. I ended up with more than average rework and received comments from management that they could not promote me because of the mistakes. I became more depressed and was having liver and stomach pain as well as dizziness and extreme tiredness. My body was causing me a great deal of pain…It became difficult to handle the increasing workload and stress associated with it. The job was a dead end for me. I looked for work while employed but didn't find anything. They fired me on January 2, 2019. I tried to get unemployment but was denied. I live with my mother who needed help doing daily tasks including bathing, meals, cleaning and getting up to the bathroom.

(Tr. 230) (*See also* Tr. 93-94, testimony that Plaintiff was fired in part due to visual impairment impacting her speed and accuracy with inputting numbers, despite her employer providing a larger monitor screen at Plaintiff's request).[19]

---

[18]In an earlier letter dated August 10, 2020, Ms. Kelly wrote that she had observed that Plaintiff's symptoms had "worsened considerably in the last several months," (Tr. 281), including a "palsy-like" shaking, balance issues, and increased mental confusion and forgetfulness. (*Id.*)

[19]The ALJ asked if Plaintiff could have used the zoom feature to enlarge the numbers. Plaintiff testified that feature was ineffective because "you couldn't do the work with just a little piece of the page showing because of the complexity of it. You had to see the whole thing…. " (Tr. 93-94). Plaintiff further testified that she used only the single larger monitor when processing an invoice. (Tr. 94).

The ALJ also discounted Plaintiff's statements concerning her vision impairment based on the fact that she continued to hold a driver's license. The record concerning the degree of Plaintiff's visual impairment is mixed,[20] but includes records that suggest the level of impairment might not be compatible with the ability to perform Plaintiff's past work. Visual acuity testing has varied by examination date. And Plaintiff has received regular injections from her ophthalmologist for macular edema, the "primary symptom" of which is "blurry or wavy vision near or in the center of [the] field of vision." https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/macular-edema#: (accessed on July 12, 2022).

On remand, the ALJ also should discuss Plaintiff's alleged fatigue. The ALJ failed to discuss Plaintiff's complaints of fatigue other than at Step 3, where the ALJ mentioned that fatigue from Plaintiff's diabetes could be evaluated under SSR 14.1p as similar to chronic fatigue syndrome. (Tr. 44). In addition to diabetes, Plaintiff's anemia, obesity, and chronic liver disease/cirrhosis/high ammonia levels all can cause fatigue. Plaintiff repeatedly testified to extreme fatigue that would prevent her from sustaining fulltime employment. Ms. Kelly's letter also reported Plaintiff's "extreme exhaustion."

Last but not least, the ALJ should reconsider the potential impact of Plaintiff's allegedly intermittent encephalopathy symptoms, including alleged dizziness, impaired cognitive functioning and slurring of words on Plaintiff's ability to sustain work over time. Plaintiff testified that encephalopathy affects her brain and that she has "times when I

---

[20]Plaintiff's medical records document significant treatment for both nonproliferative diabetic retinopathy and macular edema. In a brief discussion at the hearing, the ALJ commented "Well, apparently, it's working because there's no macular edema in the left eye and in the right eye, he indicates it's minimal." (Tr. 84). When Plaintiff started to respond: "I have a lot of - - ," the ALJ cut her off. The ALJ also emphasized that Plaintiff's ophthalmologist found vision of 20/50 in one eye and 20/30 in the other. (Tr. 84-85).

can't remember" and slurs her words a lot.  (Tr. 99-100).  Plaintiff's sister provided two written statements concerning her observations of increases in neurological symptoms, including observed palsy-like shaking, lack of balance, mental confusion, and slurring of words.  As discussed, Dr. Weber's records reflect similar concerns with the perceived progression of Plaintiff's encephalopathy, and opined that those symptoms would negatively impact her ability to sustain full-time employment.

### III.  Conclusion and Order

A sentence four remand under 42 U.S.C. § 405(g) provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions and further fact-finding is necessary. *See Faucher v. Secretary of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted).  In a sentence four remand, the Court makes a final judgment on the Commissioner's decision and "may order the Secretary to consider additional evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher*, 17 F.3d at 175.  All essential factual issues have not been resolved in this matter, nor does the current record adequately establish Plaintiff's entitlement to benefits as of her alleged onset date.  *Faucher*, 17 F.3d at 176. For the reasons explained herein, **IT IS ORDERED THAT** Defendant's decision be **REVERSED and REMANDED** under Sentence Four for further review consistent with this opinion.

 *s/Stephanie K. Bowman*
 Stephanie K. Bowman
 United States Magistrate Judge